**SPONAGLE, Exr., Appellant,**

v.

**USAIR GROUP, INC. et al., Appellees.**

[Cite as *Sponagle v. USAir Group, Inc.* (1992), 81 Ohio App.3d 789.]

Court of Appeals of Ohio,
Montgomery County.

No. 13059.

Decided July 16, 1992.

790

*Peter H. Weinberg* and *Noah Kushlefsky*, for appellant.

*John E. Martindale* and *Margaret Mary Meko*, for appellees USAir Group, Inc. and Piedmont Aviation, Inc.

*Neil F. Freund* and *Chris Carrigg*, for appellees Jetstream International Airlines, Inc. and Peggy L. Poynter.

WOLFF, Judge.

Mary Sponagle, independent executor of the estate of Robert Carter, filed a complaint August 15, 1990 in the Montgomery County Court of Common Pleas against USAir Group, Inc., d.b.a. USAir; Piedmont Aviation, Inc., d.b.a. Piedmont Airlines; Jetstream International Airlines, Inc., d.b.a. Piedmont

Commuter; and Peggy L. Poynter, as administrator of the estate of Clarence E. Poynter.

On June 13, 1991, the trial court sustained motions for summary judgment by USAir and Piedmont Airlines (also referred to as "Piedmont"), and dismissed the complaint as to these two parties. At the same time, the trial court overruled motions for summary judgment on behalf of Jetstream and Peggy L. Poynter, administrator. Jetstream and Poynter moved for reconsideration, and on August 28, 1991, the trial court sustained the motion for reconsideration and dismissed the complaint as to these remaining parties.

The principal reason for the trial court's dismissing the complaint as to USAir and Piedmont was its determination that there was no actual or apparent agency relationship between these two parties and Jetstream. The trial court dismissed the complaint as to Jetstream and Poynter for the reason that Sponagle's Ohio claims against these parties were time-barred. Sponagle assigns as error the trial court's granting summary judgment in favor of all defendants.

## I. Claims against Jetstream and Poynter

■ This litigation stems from a plane crash that occurred February 9, 1988. At that time, Robert Carter, an employee of Jetstream, was in training aboard the aircraft. The aircraft was piloted by Clarence E. Poynter, an employee of Jetstream. In addition to piloting the aircraft, Poynter was in charge of the instruction of Carter and a third Jetstream employee aboard the aircraft, Karen Lethbridge. Carter, Poynter and Lethbridge were all killed in the crash.

On September 19, 1989, Sponagle commenced an action in the circuit court of Cook County, Illinois, against British Aerospace, PLC; British Aerospace, Inc.; USAir Group, Inc.; Piedmont Aviation, Inc.; Jetstream International Airlines; and Peggy L. Poynter, as administrator of the estate of Clarence E. Poynter. The record reflects that Jetstream moved to quash service of summons for the reason that it had been served outside the state of Illinois and was not subject to the long-arm provisions of the Illinois Code of Civil Procedure or the Illinois Revised Statutes. The record also reflects that on February 26, 1990, the Illinois court entered an order which reflected that a motion to dismiss had been made on the basis of *forum non conveniens* by British Aerospace, Inc., USAir Group, Inc., Piedmont Aviation, Inc., and Peggy Poynter, as administrator of the estate of Clarence Poynter. The order sustained the motions of these moving parties. In November 1990, the Illinois court entered an order *nunc pro tunc* to February 26, 1990, ordering the case dismissed pursuant to the doctrine of *forum non conveniens*.

Illinois Supreme Court Rule 187(c)(2) provides that if a plaintiff whose complaint has been dismissed on the basis of *forum non conveniens* by an Illinois court brings his or her action in another forum within six months of the dismissal order, "the defendant" is required to accept service of process in the new forum and to waive the statute of limitations defense in the event that the statute of limitations has run. Failure of the defendant to abide by these conditions results in the reinstatement of the action in Illinois. On August 15, 1990, Sponagle filed her complaint in Ohio against USAir, Piedmont, Jetstream and Peggy Poynter.

In ruling on the defendants' motions for summary judgment, the Ohio trial court initially determined that because Sponagle had timely filed in Illinois, Jetstream and Poynter were bound by the above-mentioned provisions of the Illinois rule. In their motion for reconsideration, Poynter and Jetstream argued that the only claim by Sponagle against them was one of intentional tort, which had a one-year statute of limitations, pursuant to R.C. 4121.80. Thus, they argued that because the Illinois action had been filed more than one year after the airplane crash, the Illinois action had been untimely as to them, and Sponagle's Ohio claim against them was likewise time-barred. The trial court was persuaded by this argument and dismissed the complaint as to Poynter and Jetstream.

The day before the trial court dismissed the complaint as to Jetstream and Poynter, the Ohio Supreme Court decided *Brady v. Safety–Kleen Corp.* (1991), 61 Ohio St.3d 624, 576 N.E.2d 722, which declared R.C. 4121.80 "unconstitutional *in toto.*" At this juncture, all parties appear to agree that the two-year period of limitation of Ohio's wrongful death statute, R.C. 2125.02(D), is the appropriate statute of limitations. The Illinois action against Poynter was filed within two years of the airplane crash that took Robert Carter's life. Poynter moved to dismiss the Illinois action on the basis of *forum non conveniens*, and is thus bound by the provisions of the Illinois rule, *supra.* The trial court's dismissal of the complaint as to Poynter must be reversed. Indeed, Poynter does not argue to the contrary in her appellate brief.

■ Jetstream did not move to dismiss on the basis of *forum non conveniens* in Illinois. Thus, the Illinois rule governing dismissals for *forum non conveniens* is not binding upon Jetstream. (The Illinois rule does not address the situation presented here of multiple defendants, some of whom move for dismissal on *forum non conveniens* grounds, others of whom do not.) Sponagle's Ohio action against Jetstream was filed more than two years after the airplane crash that took the life of Robert Carter, and is thus barred by the two-year period of limitation for wrongful death imposed by R.C. 2125.-

02(D). The fact that this action was brought at least in part on behalf of Carter's minor daughter did not toll the running of the two-year period of limitation. See *Taylor v. Black & Decker Mfg. Co.* (1984), 21 Ohio App.3d 186, 21 OBR 199, 486 N.E.2d 1173.

As it pertains to Jetstream, Sponagle's assignment of error is overruled. As it pertains to Poynter, Sponagle's assignment of error is sustained.

## II. Claims Against Piedmont and USAir

The trial court sustained the motions for summary judgment of USAir and Piedmont because the evidence failed to create an issue of fact as to whether Jetstream was either the actual or apparent agent of either Piedmont or USAir.

At the time of the crash, Jetstream was a wholly owned subsidiary of Piedmont, which in turn was a wholly owned subsidiary of USAir. Piedmont and Jetstream had an agreement whereby Jetstream provided commuter services between airports not serviced by Piedmont and airports serviced by Piedmont. Piedmont and Jetstream each had contractual obligations to the other under this agreement.

Section 7.01(a) of the agreement stated:

"Contractor (i.e. Jetstream) Shall Act As An Independent Contractor

"The employees, agents and/or independent contractors of Contractor engaged in performing any of the services Contractor is to perform pursuant to this Agreement shall be employees, agents, and independent contractors of Contractor for all purposes, and under no circumstances shall be deemed to be employees, agents or independent contractors of Piedmont. In its performance under this Agreement, Contractor shall act as an independent contractor and not as an agent for Piedmont. Piedmont shall have no supervisory power or control over any employees, agents or independent contractors engaged by Contractor in connection with its performance hereunder and all complaints or requested changes in procedures shall, in all events, be transmitted by Piedmont to a designated officer of Contractor. Nothing contained in this Agreement is intended to limit or condition Contractor's control over its operations or the conduct of its business, and Contractor and its principals assume all risks of financial losses which may result from the operation of the air services to be provided by Contractor hereunder."

In determining that there was no evidence of an actual agency relationship between Piedmont and Jetstream, the trial court relied on *Baird v. Sickler* (1982), 69 Ohio St.2d 652, 23 O.O.3d 532, 433 N.E.2d 593. In *Baird*, the court held that for purposes of *respondeat superior*, an agency relationship exists when "one party exercises the right of control *over the actions* of another and

those actions are directed toward the attainment of an objective which the former seeks." (Emphasis added.) *Id.* at 654, 23 O.O.3d at 533, 433 N.E.2d at 595. While Jetstream's activities under the agreement were directed to the attainment of Piedmont's objective of "improved service," we agree with the trial court that there was no issue of material fact as to whether Piedmont had, or exercised, the right of control over the actions of Jetstream. *Id.* See, also, 3 Ohio Jurisprudence 3d (1978) 17, Agency, Section 4. Although Sponagle correctly notes that the actions of parties can belie their words, such is not the case here. When the evidence before the trial court is construed most strongly in her favor, what existed between Piedmont and Jetstream was no more than an agreement between a major airline and a commuter airline to provide various services for each other. The evidence is wholly consistent with the stated intention of Piedmont and Jetstream that Jetstream was to act as an independent contractor and not as Piedmont's agent.

The evidence did not tend to establish an agency relationship between USAir and Jetstream.

■ Sponagle also claims that USAir and Piedmont should be liable to her on a theory of agency by estoppel. Sponagle's contention appears to be that USAir and Piedmont, by their actions, caused Carter to "justifiably believe that" although he was hired by and working for Jetstream, Jetstream "was acting on Piedmont's behalf in preparing him for a job with Piedmont."

Sponagle points to three factors in support of her claim of agency by estoppel: (1) Jetstream's use of Piedmont's logo on its planes; (2) Jetstream's employment application, which states at the top: "PIEDMONT COMMUTER Operated by JETSTREAM"; and (3) a so-called "flow through" arrangement between Jetstream and Piedmont. As to the alleged "flow through" agreement, Sponagle submitted evidentiary material tending to establish that smaller carriers like Jetstream had difficulty in retaining their pilots, who generally wanted to move up to larger airlines. The alleged "flow through" agreement provided that in return for Jetstream pilots working a certain minimum period of time for Jetstream to help reduce Jetstream's attrition problem, those pilots would be given preferential treatment by Piedmont when Piedmont hired pilots.

USAir and Piedmont moved to strike certain evidence presented by Sponagle in support of her claim of agency by estoppel. The trial court overruled the motion to strike as moot. Presumably, the trial court concluded that notwithstanding that certain of Sponagle's evidence might have been inadmissible pursuant to Civ.R. 56(C), Sponagle's evidence, even taken at face value, failed to establish agency by estoppel.

*Johnson v. Wagner Provision Co.* (1943), 141 Ohio St. 584, 26 O.O. 161, 49 N.E.2d 925, paragraph four of the syllabus, provides:

"The doctrine of agency by estoppel, as it might be invoked by a plaintiff in a tort action, rests upon the theory that one has been led to rely upon the appearance of agency to his detriment. It is not applicable where there is no showing of induced reliance upon an ostensible agency."

It is clear that the "appearance of agency" must be created by the principal. In *Logsdon v. ABCO Constr. Co.* (1956), 103 Ohio App. 233, 241–242, 3 O.O.2d 289, 293, 141 N.E.2d 216, 223, this court approved the following jury instruction:

" 'This authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency. It is essential that two important facts be clearly established: (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority. The apparent power of an agent is to be determined by the act of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of the authority and not where the agent's own conduct has created the apparent authority.' "

In support of its motion for summary judgment, Piedmont presented evidence that Poynter, Carter and Lethbridge were employed by Jetstream; that Piedmont had never employed Carter, offered Carter employment, or otherwise dealt with him as to his activities as a pilot for Jetstream; that Piedmont did not select Carter for any training program of Piedmont or Jetstream; and that Piedmont did not direct, supervise, or intervene in Jetstream's pilot training operations. In short, Piedmont's evidence was to the effect that it did not consciously do anything that would have led Carter to believe that Jetstream was acting on its behalf, or was subject to its control, in preparing him for a job with Piedmont.

Sponagle relied on six items of evidence to support her claim of agency by estoppel: (1) Jetstream's use of the Piedmont logo on its planes, (2) Jetstream's employment application, (3 through 5) affidavits of Peggy Aldhizer, Leslie Lethbridge and Edward Quick, and (6) an unsworn letter to her counsel from John Shattuck. Piedmont moved to strike all but the first item. Sponagle opposed Piedmont's motion except as to the sixth item, the Shattuck

letter, which was clearly inadmissible under Civ.R. 56(C). Absent insight from the trial court as to whether it disregarded any of Sponagle's evidence, we will assume it considered everything but the Shattuck letter.

Peggy Aldhizer, according to her affidavit, is Robert Carter's "foster sister." Her affidavit stated:

"2. Robert and I grew up together and were always very close. We spoke with each other often and spent many holidays together. My son, Michael Aldhizer, stayed with Robert for a week every summer.

"3. Robert often discussed his career as a pilot with me and he spoke about Jetstream International/Piedmont Commuter often.

"4. I recall that after Robert was initially hired by Jetstream International/Piedmont Commuter he was ecstatic. He felt that this was his big break in that he finally got his foot in the door of a major airline, specifically, Piedmont Airlines. Robert Carter related that his job at Jetstream was an airbus to Piedmont Airlines.

"5. Robert further indicated that it was well known in the industry that Jetstream International/Piedmont Commuter was the first step for a career with Piedmont Airlines and it was my understanding that the training and flight experience Robert had at Jetstream would be the start of his career at a major air carrier, Piedmont Airlines."

Leslie Lethbridge is Karen Lethbridge's mother. Her affidavit stated:

"1. I am the plaintiff in this action and the mother of Karen Lethbridge, the pilot whose death in an airplane crash is the subject of this lawsuit. I swear that the statements made herein are true to the best of my knowledge. I am aware that any false statements may subject me to penalty for perjury.

"2. Karen and I were always very close, and we talked often about her career and her goals. She graduated from Kent State University in December of 1986, and moved back home with us in Henrietta, New York.

"3. Karen was very excited about joining Jetstream International/Piedmont Commuter as a pilot. We had several conversations discussing her future. Karen told me that Piedmont Commuter was a subsidiary of Piedmont Airlines, and that working for Piedmont Commuter was a stepping stone to a career with Piedmont, which was a larger, major airline.

"4. Karen said that commuter airlines sometimes had trouble keeping pilots from defecting to other large carriers. So Piedmont and Piedmont Commuter had a program where pilots who joined Piedmont Commuter [and] were trained and flew a certain amount of time with them would get priority and preferential treatment when applying to Piedmont.

"5.  It was Karen's understanding that the training and experience she was receiving from Jetstream would permit her to eventually join Piedmont as a pilot."

Edward Quick's affidavit stated:

"1.  I was a pilot for Jetstream International Airlines, doing business as Piedmont Commuter from December 15, 1986 until October of 1989.  During that time I was the pilot's union representative and helped organize the pilot's union at Jetstream.  As such, I am familiar with the hiring practices at Jetstream.  I am willing, if necessary, to testify under oath at trial to the matters stated herein.  I swear that the statements made herein are true to the best of my knowledge.  I am aware that any false statements may subject me to penalty for perjury.

"2.  Like all small commuter airlines, Jetstream has a problem with attrition.  Young pilots join Jetstream and other commuter airlines to build up their experience and flying time and then apply to larger air carriers.

"3.  Pilots who were hired were told that if they trained and flew at Jetstream for a certain period of time, they would receive preferential treatment when applying to move up to Piedmont.

"4.  During my employment with Jetstream, a memo was circulated by management which detailed the preferential treatment that Jetstream pilots would be given by Piedmont.

"Specifically, they could skip the first interview and begin with the second phase of the hiring process.  Jetstream pilots with two years' experience simply had to make a phone call to schedule an interview with Piedmont.  Moreover, the President of Jetstream would give the pilot a recommendation.

"5.  In early 1987, Calvin Humphrey, the president of Jetstream, appeared at a pilots' meeting.  At that meeting Mr. Humphrey stated that a certain number of Jetstream pilots would move into positions with Piedmont Airlines each year.

"6.  In order to attract qualified young pilots and encourage them to stay on at Jetstream, candidates were informed of the relationship between Piedmont and Jetstream.  Pilot candidates were flown to their interview by Piedmont and were informed that Jetstream was a wholly owned subsidiary of Piedmont, and were led to believe that working for Jetstream was a stepping stone to a career with Piedmont."

Construing the evidence most strongly in Sponagle's favor, we conclude that the trial court properly determined that the evidence failed to support a claim of agency by estoppel.

For purposes of *respondeat superior,* an actual agency relationship exists when one party exercises the right of control over the actions of another and those actions are directed toward the attainment of the former's objective. *Baird, supra.* For purposes of *respondeat superior,* an agency by estoppel may arise when one party, by his conduct, creates the impression that he exercises the right of control over the actions of another, which actions are directed to the attainment of the former's objective, and that impression is relied upon by a third party to his detriment.

Although Jetstream was required by its agreement with Piedmont to use the Piedmont logo on its planes, this does not support a claim that Piedmont created the impression that it had a right of control over the actions of Jetstream in Jetstream's hiring and training of pilots. Nor does the evidence establish that Robert Carter relied upon any possible impression created by the Piedmont logo.

There is no evidence that Piedmont was responsible for the Jetstream employment application, or that Carter relied on any possible impression created by the employment application.

Evidence of the so-called "flow through" agreement between Piedmont and Jetstream likewise does not support the claim that Piedmont created the impression that it exercised the right of control over Jetstream in its hiring and training of pilots. At most, the "flow through" agreement provided Carter with an opportunity for future preferential treatment by Piedmont in its process of hiring pilots. Carter could not, however, have reasonably concluded from the existence of the "flow through" agreement that Piedmont exercised the right of control over the actions of Jetstream in Jetstream's hiring and training of pilots. Indeed, there is no evidence that Carter had any such belief.

There was no evidence tending to establish agency by estoppel on the part of USAir.

The assignment of error as it relates to USAir and Piedmont Airlines is overruled.

Except as to defendant Poynter, the judgment will be affirmed. As to defendant Poynter, the judgment will be reversed, and this cause will be remanded for further proceedings consistent with this opinion.

*Judgment accordingly.*

Fain, P.J., and Grady, J., concur.